RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0112p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee*,

    *v.*

ERIC PAUL WENDLANDT,
                *Defendant-Appellant.*

No. 11-2018

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cr-5-1—Robert J. Jonker, District Judge.

Decided and Filed: April 19, 2013

Before: SUTTON and GRIFFIN, Circuit Judges; DOWD, District Judge.[*]

_____

**COUNSEL**

_____

**ON BRIEF:** David A. Dodge, DODGE & DODGE, P.C., Grand Rapids, Michigan, for Appellant. Mark A. Totten, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. Defendant Eric Wendlandt appeals his above-Guidelines sentence of forty-two months of imprisonment imposed after he pled guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. His conviction stems from a mortgage fraud scheme that caused the U.S. Department of Housing and Urban Development ("HUD") to insure loans for unqualified applicants

___

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

based upon forged documents and false information provided by Wendlandt. The substantial financial losses to HUD that ensued were, of course, inevitable.

On appeal, Wendlandt contends that his sentence is both procedurally and substantively unreasonable. Specifically, he challenges both the district court's computation of financial loss for purposes of determining his offense level under U.S.S.G. § 2B1.1 (Nov. 1, 2010), and also the court's decision to vary upward from the advisory Guidelines range of twenty-four to thirty months in prison. For the reasons that follow, we conclude that Wendlandt's claims are without merit and therefore affirm his sentence.

I.

Eric Wendlandt devised a mortgage fraud scheme that began sometime prior to February 2008 and continued to March 2010, in Kent County, Michigan. HUD, through the Federal Housing Administration ("FHA"), administered a mortgage insurance program designed to ensure adequate housing for low-income individuals by providing mortgage insurance to lenders who made home loans to those individuals. In order to receive an FHA-insured loan, home buyers were required to establish that their income was sufficient to meet the mortgage payments. HUD required the lenders making the loans to verify the potential buyers' employment and income, which could be accomplished by submitting a "Verification of Employment" form, pay stubs, and other documentation. HUD granted so-called Direct Endorsement Authority for FHA loans to certain lenders. Under this program, the lender determined whether the home buyer was eligible for an FHA-insured loan, and, if so, the lender submitted the application and requisite documentation to HUD. Wendlandt's mortgage brokerage company, Precise Mortgage, was never granted Direct Endorsement Authority.

Nonetheless, starting in February 2008, Wendlandt and codefendant Pleasz Daniels, who was employed by Precise Mortgage as a mortgage broker, initiated a scheme to defraud HUD by using forged and counterfeited documents, and false information, to secure FHA-insured loans for otherwise unqualified buyers who appeared to satisfy the agency's requirements. Wendlandt fraudulently represented to

HUD that the loans originated with Indigo Financial ("Indigo"), a mortgage company that did possess Direct Endorsement Authority. Wendlandt and the owner of Indigo were friends. As a result of Wendlandt's scheme, unqualified buyers were approved for home loans insured by the FHA, and when the buyers defaulted on their mortgage payments, HUD was required to reimburse the lending institutions for losses incurred in foreclosure. Meanwhile, Wendlandt and Daniels enriched themselves by collecting commissions and fees charged for originating the fraudulent loans.

In March 2010, after auditing several suspicious Precise Mortgage files, HUD investigators interviewed Wendlandt regarding improprieties in the origination of numerous FHA-insured mortgages. Wendlandt admitted to Special Agent Jason Russell that Precise Mortgage had initiated approximately one hundred FHA mortgages that were then processed by Indigo. Wendlandt estimated that twenty percent of these mortgages were fraudulent.

In January 2011, the government charged Wendlandt with conspiracy to defraud the United States, 18 U.S.C. § 371. One week later, he entered into a written plea agreement and pled guilty to the charge.

The district court sentenced Wendlandt on August 9, 2011. The central issue in dispute was the computation of the financial loss incurred by HUD for sentencing purposes under U.S.S.G. § 2B1.1(b)(1) (Nov. 1, 2010), which increases the base offense level proportionate to the loss associated with the crime. The loss calculation was derived from the three fraudulent mortgages underlying the felony information, for the following properties in Grand Rapids, Michigan: (1) 3015 Plainfield Avenue, NE; (2) 834 Sherman Avenue, SE; and (3) 7174 Martin Avenue, SE.[1]

The government's "best estimate" of the total pecuniary loss to HUD arising from these failed loans was $262,790.48, using a comparative market analysis (2010 and 2011 median sales prices) prepared by HUD appraiser Kathy Coon. With regard to the

---

[1] Prior to the sentencing hearing, the government conceded that a fourth property should not be included in the calculation of loss because the fraudulent loan was processed by codefendant Daniels after he left Precise Mortgage's employment.

Martin Avenue and Sherman Avenue properties, the government's loss estimation of $97,276.36 and $139,437.22, respectively, was based upon a formula that subtracted the fair market value of the properties from the outstanding loan balance or claim paid by HUD. The mortgage for the Plainfield Avenue property had been modified by the lender to allow the borrower to stay in the home and, because the post-modification loan was issued on the basis of legitimate credit and earnings information, default was unlikely. The government therefore asserted that the normal "loan balance minus fair market value" equation was irrelevant, and the proper measure of loss with respect to this property was the amount HUD reimbursed the lender for principal and interest foregone in the modification, $26,076.90. The government filed a motion for an upward variance, arguing that a sentence above the recommended Guidelines range was warranted because the financial loss to HUD did not adequately measure the seriousness of the crime or its collateral effects on individuals and the community at large.

Wendlandt opposed the government's motion, contending that the circumstances of his crime did not justify a heightened sentence. In addition, Wendlandt filed a motion for a downward variance, in which he asserted that the factors under 18 U.S.C. § 3553(a) favored a lower sentence. Wendlandt submitted his own appraisals of the three properties in question, prepared by certified appraiser Karen Leppek using a sales-comparison approach. Wendlandt's position was that in light of unforeseen market developments (the burst in the housing bubble) and the government's purportedly deficient proofs regarding losses attributable to him, the amount of loss should be zero or no greater than an eight-level enhancement under U.S.S.G. § 2B1.1(b)(E) (a loss greater than $70,000 but less than $120,000).

At the sentencing hearing, the parties' appraisers testified as to their valuations of the three properties. Karen Leppek opined that the government's appraisals were liquidation values not representative of the fair market value of the properties. Two of the mortgagors who fell victim to Wendlandt's fraud testified about his deceptions and the enormous hidden fees, costs, and financial losses they incurred. Special Agent

Russell testified about the details of HUD's underlying investigation and his interview with Wendlandt.

At the conclusion of the hearing, the district court adopted the government's loss calculation of $262,790.48.  To calculate the Guidelines range, the court started with the base offense level of six points, applied a twelve-level enhancement representing a loss amount between $200,000 and $400,000 under § 2B1.1(b)(1)(G), added two points for Wendlandt's leadership role in the offense, and then subtracted three points for acceptance of responsibility and a timely plea.  With a total offense level of seventeen and a criminal history category I, the advisory Guidelines range was twenty-four to thirty months of imprisonment.  The court reviewed the relevant § 3553(a) factors on the record, granted the government's motion for an upward variance, and sentenced Wendlandt to forty-two months in prison, three years of supervised release, and $165,514.12 in restitution.

Wendlandt now timely appeals his sentence, arguing the district court procedurally erred in calculating the loss amount for purposes of U.S.S.G. § 2B1.1, and that the court's upward variance is substantively unreasonable.

## II.

"We review a district court's sentence for abuse of discretion, whether inside, just outside, or significantly outside the Guidelines range, and for both procedural and substantive reasonableness."  *United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012) (citation and internal quotation marks omitted).  Procedural reasonableness review involves "ensur[ing] that the district court properly calculated the Guidelines range, did not treat the Guidelines as mandatory, considered the factors set out in 18 U.S.C. § 3553(a), did not select a [sentence] based on clearly erroneous facts, and adequately explained its sentence."  *Id*.

"When reviewing a district court's application of section 2B1.1(b)(1), we review the district court's factual finding as to amount of loss for clear error."  *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011).  The method used to calculate loss is reviewed

de novo.  *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010).  "An error with respect to the loss calculation is a procedural infirmity that typically requires remand." *Id.*

In determining loss under U.S.S.G. § 2B1.1, the court must use the greater of actual or intended loss.  U.S.S.G. § 2B1.1 cmt. n.3(A).  The Guidelines define "actual loss" as "reasonably foreseeable pecuniary harm," which connotes the monetary harm "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.* at cmt. n.3(A)(i), (iii), (iv).  "Intended loss" is "the pecuniary harm that was intended to result from the offense," including "pecuniary harm that would have been impossible or unlikely to occur."  *Id.* at cmt. n.3(A)(ii).

Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court "need only make a reasonable estimate" of the loss using a preponderance of the evidence standard.  *Jone*s, 641 F.3d at 712 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)); *see also United States v. Howley*, 707 F.3d 575, 583 (6th Cir. 2013) ("The Guidelines require only a reasonable estimate of actual or intended loss within broad ranges.") (quotation marks omitted).  "[T]he Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss."  *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004).  "Default by a woefully unqualified home-loan borrower is so likely that . . . the pecuniary harm . . . will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan."  *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) (citation and internal quotation marks omitted).

In the present context—a fraud crime involving collateral pledged or otherwise provided by the defendant—the district court must reduce the loss by the amount of money the victim recovered by selling the collateral, or the fair market value of the property at the time of sentencing if the victim has not disposed of the collateral. U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *United States v. Minor*, 488 F.  App'x 966, 969 (6th Cir. 2012) (per curiam); *United States v. VanderZwaag*, 467 F. App'x 402, 413 (6th Cir. 2012).

Wendlandt argues that the district court erred in computing the loss under U.S.S.G. § 2B1.1(b)(1), resulting in an incorrect Guidelines range. In a nutshell, he maintains that the court should not have accepted what he considers HUD's commercially unreasonable "fire-sale" valuations, and that the court attributed losses to him that were neither sufficiently documented nor directly attributable to his crime for several reasons.

As a preliminary matter, we can quickly dispatch one of Wendlandt's arguments—that he should have received a larger credit against loss because of the unforeseeable downturn in the housing market and the diminishment in the value of the three properties. We recently addressed and rejected this very argument in *Minor*, stating:

> Unlike the application note regarding the *determination* of loss, the application note regarding *credits* against loss does not speak in terms of foreseeability. [U.S.S.G. § 2B1.1 cmt. n.3(A), (E)]. The sentencing guidelines, therefore, require foreseeability of the loss of the unpaid principal, but do not require foreseeability with respect to the future value of the collateral.

*Minor*, 488 F. App'x at 969. *See also United States v. Mallory*, 461 F. App'x 352, 361 (4th Cir. 2012) (per curiam) ("[I]t is of no consequence that the housing collapse was not reasonably foreseeable to Mallory. He receives the benefit of what the victims recovered, not what they foreseeably might have recovered."); *Turk*, 626 F.3d at 751 ("[A]ll of [the defendant's] arguments about the extrinsic forces that caused the value of the collateral to decline are simply irrelevant—they may or may not be true, and she might have earned a credit against loss if they had not occurred, but she may not invoke them to insulate her from responsibility for the loss she *caused*, namely, the loss of the unpaid loan principal."). The plain language of the Guideline does not require that we factor extrinsic market conditions into the calculation of credits against loss.

### A. The Plainfield Property

Unlike the other two properties at issue in this case, after Wendlandt prepared the false documents to qualify a buyer for the HUD-insured loan to purchase the Plainfield property, the buyer successfully sought a loan modification that reduced the monthly payment. HUD was required to make a $26,076.90 insurance payment to the lender, which equaled the amount by which the lender reduced the loan as a result of the modification. The district court found that this amount represented the actual loss attributable to Wendlandt.

Wendlandt contends that in the case of a performing loan, any loss to HUD would be the difference between the appraised fair market value of the property and the balance remaining on the loan (according to his computation, $72,616.46). He argues that because the appraised value—either the government's appraisal of $96,900 or Leppek's appraisal of $107,500—exceeds the loan balance, the loss is zero.

However, as the district court found, the cost of the subsequent loan modification constitutes a reasonably foreseeable, calculable loss to HUD that falls squarely within the definition of actual loss under § 2B1.1 cmt. n.3(A)(i), (iii). When Wendlandt fraudulently procured the HUD-insured loan for the otherwise unqualified borrower, he knew, or reasonably should have known, that the borrower might have to seek a loan modification to maintain monthly payments on the mortgage. Serendipitously for Wendlandt, the buyer of the Plainfield property was able to obtain the loan modification rather than resort to other alternatives such as default, which would have resulted in a much higher loss.

Moreover, the loss amount adopted by the district court was a reasonable estimate supported by a preponderance of the evidence. Agent Russell and Kathy Coon testified that $26,076.90 was the amount of the insurance claim filed by the lender, that HUD was required under its insurance program to pay this difference in the modification, and that this was a permanent loss because HUD would not receive reimbursement if the owner sold the house for a higher price. Thus, the district court did not clearly err in its loss calculation pertaining to the Plainfield property.

### B. The Martin Property

The buyer of the Martin property was codefendant Daniels. According to Agent Russell, Wendlandt admitted that he wrote two large fraudulent paychecks to Daniels, with the agreement that Daniels would cash the checks and then return the money to create the appearance that Daniels had a high income. Wendlandt knew that Daniels intended to purchase the house not to live in, but to run as an adult foster care program, which violated the terms of FHA loans. Wendlandt helped secure a highly inflated appraisal so that Daniels could use the loan to purchase both the house and the existing business. Daniels pled guilty in federal court to felony fraud on April 19, 2011, and his sentencing was pending at the time Wendlandt was sentenced.

At Wendlandt's sentencing hearing, the government anticipated that the property was "almost certain to go into default" after Daniels' sentencing and likely imprisonment, and argued that the loss amount attributable to Wendlandt on account of this fraudulent loan should be $97,276.36, the difference between the government's proffered fair market value of $99,900 and the remaining balance on the fraudulent loan, $197,176.36. Defense counsel represented to the court that Daniels' mother was going to take over the loan payments and, consequently, the loss amount should be zero because this mortgage was not in default at the time of sentencing. The district court adopted the government's proposed loss formula for the Martin property.

Wendlandt's argument that the loss amount should be zero because there was not actual loss at the time of sentencing overlooks the relevance of "intended loss" under § 2B1.1. The Guideline instructs a sentencing court to include the greater of actual *or* intended loss, the latter being the "pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). Our court has further defined intended loss "as the loss the defendant subjectively intended to inflict on the victim," not the potential loss (the gross amount of a fraudulently obtained loan). *United States v. Moored*, 38 F.3d 1419, 1427 (6th Cir. 1994). Although we have subsequently reaffirmed *Moored*'s definition in two cases without extensive discussion, *see United States v. Newson*, 351 F. App'x 986, 988 (6th Cir. 2009); *United States v. Wade*, 266 F.3d 574,

586 (6th Cir. 2001), *Moored* interpreted a sentencing Guideline, U.S.S.G. § 2F1.1, which has since been materially amended in 2001 to delete references to "expected" and "probable" loss, and consolidated with U.S.S.G. § 2B1.1.  Our court has not had occasion to address the meaning of "intended loss" under the current version of § 2B1.1, and it is worth noting that there is considerable disagreement among our sister circuits as to what the optimal measure of "intended loss" should be—an objective or subjective analysis, and whether constructive, as opposed to actual, intent will suffice.  *See generally* Gabrielle A. Bernstein, Comment, *The Role of Expectations in Assessing Intended Loss in Mortgage-Fraud Schemes*, 2010 U. Chi. Legal Forum 337, 341-42 (2010) (and cases collected therein).

However, although the parties now debate its fine points, the present case is not the appropriate vehicle to resolve this complex issue because the topic of "intended loss" in reference to the Martin property was never raised below by Wendlandt, and the formula employed by the district court was, under the generous latitude afforded by the "reasonable estimate" standard, an acceptable and accurate measure of "the pecuniary harm that was intended to result from [Wendlandt's] offense."  *See United States v. Appolon*, 695 F.3d 44, 69 (1st Cir. 2012) (holding that the district court's calculation of intended loss as the original mortgage loan amount less the property's assessed value at the time of sentencing "was a reasonable proxy for culpability in the circumstances of th[e] case," where the defendants were "veterans of the real estate industry" who "knew that the mortgage loans on the properties involved in their scheme would enter default" and "that the properties would be grossly devalued as a result"); *United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007) ("As McCoy was obtaining loans for individuals with low income and poor credit, he could—and should—have expected that the banks would probably recover only the value of the mortgaged properties.  Intended loss was therefore the value of the loans less the expected value of the properties.").

The district court heard ample testimony from Agent Russell about Wendlandt's admitted central role in fraudulently securing the loan for the Martin property, and we have no reason to conclude that the court clearly erred in crediting this testimony, or that

the government's valuation of the property, accepted by the district court, was "outside the realm of permissible computations." *United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998).

### C.  The Sherman Property

At the time of Wendlandt's sentencing, the Sherman property already had gone into foreclosure, requiring HUD to reimburse the mortgage lender $159,337.22 in loan proceeds and foreclosure costs.  The district court found by a preponderance of the evidence that the government's appraisal of $19,900 represented a reasonable estimate of the property's fair market value and, subtracting this valuation from HUD's reimbursement costs, found the loss amount to be $139,437.22.

Wendlandt contends that because this mortgage was a refinance obtained by the borrower in order to lower payments so that he could afford to keep the property, the district court should have subtracted from the loss an amount equal to the outstanding balance on the original loan at the time of refinancing—that is, if the original loan was HUD-insured.  Wendlandt reasons that if this factual predicate is true, HUD was already "on the hook" for the original loan.  He further asserts that his proffered fair market value of $60,000 is more accurate than the government's liquidation value of $19,900.

Whether or not HUD insured the original loan to purchase the Sherman property is of no moment.  HUD agreed to insure the refinance on the basis of Wendlandt's fraudulent representations; absent these falsities, HUD would never have insured the buyer.  HUD's obligation to pay on the lender's claim is directly attributable to Wendlandt's wrongdoing.

Moreover, the district court's adoption of the government's $19,900 fair market value is entitled to appropriate deference. It was derived from the testimony of appraiser Coon, who looked at comparable properties in the area that sold for prices between $5,900 and $87,500.  The median value of the sale prices for all of these similarly situated properties was $19,900.  At the time of sentencing, the Sherman property had not yet sold, and HUD did not have it on the market.  Coon testified that HUD

previously had listed the house twice—at $16,000 and then at $22,000, albeit in a relatively short time period.  She concluded that $19,900 represented the fair market value of the property.  Although Wendlandt's appraiser Karen Leppek arrived at a much higher fair market value, Coon's estimate represented an equally valid estimate of the property's fair market value using a standard appraisal method.

To the extent Wendlandt complains that the government's valuation is an unfair "fire-sale" price and that we are bound to follow the burden-shifting commercial reasonableness standard in *United States v. Willis*, 593 F.2d 247, 258–59 (6th Cir. 1979), we disagree.  *Willis* is inapposite.  It involved the collection of a lawful secured debt and the commercially reasonable disposition of collateral pursuant to the requirements of the Uniform Commercial Code.  The sentencing Guidelines contain no such requirement and call for only a reasonable estimate of the fair market value.  *See United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012) ("While a fact-finder would be entitled to take into account the distressed circumstances of 'underwater' property owners in deciding whether a short-sale price accurately reflects the fair market value of the property, no rule of law disqualifies such a sale as evidence of the fair market value.").

In sum, we find nothing in the district court's calculation of loss under § 2B1.1 that renders Wendlandt's sentence procedurally unreasonable.

III.

Wendlandt also challenges the substantive reasonableness of his sentence, objecting to the district court's twelve-month upward variance on several grounds.

A sentence is substantively unreasonable if the sentencing court arbitrarily selected the sentence, based the sentence on impermissible factors, failed to consider pertinent § 3553(a) factors, or gave an unreasonable amount of weight to any pertinent factor.  *Cunningham*, 669 F.3d at 733.  "When a district court considers the relevant 3553(a) factors in-depth and reaches its determination that the appropriate sentence varies outside the advisory guidelines range, we are very reluctant to find the sentence unreasonable."  *United States v. Collington*, 461 F.3d 805, 811 (6th Cir. 2006).

"Although we may consider the extent of the deviation in reviewing a district court's sentence, we 'must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.'" *United States v. Lanning*, 633 F.3d 469, 476 (6th Cir. 2011) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

At sentencing, the district court concluded that the measure of loss under U.S.S.G. § 2B1.1 did not accurately reflect Wendlandt's culpability—the costs to the government stemming from his lies were not only monetary, but involved considerable time and effort in investigating the matter; moreover, Wendlandt admitted his involvement in at least twenty fraudulent loans, not merely the three loans that were the focal point of the prosecution. This, in the eyes of the court, constituted a "serious wrongdoing, and it's a pattern of wrongdoing."

Wendlandt's contention that the court's finding that he committed mortgage fraud on at least twenty occasions is based on "speculation" rings hollow. According to Agent Russell, Wendlandt admitted during his interview that of the one hundred loans originated through Indigo, approximately twenty were obtained using fraudulent documents. Wendlandt made the tactical decision to withdraw his objection to this point at sentencing, and he cannot now attempt to resurrect an objection that he expressly waived below.

The district court also considered Wendlandt's character—or lack thereof—and his "troubling tendency to diminish and minimize the nature of his wrongdoing" as a factor warranting the upward variance. In this regard, the court cited the sentencing-hearing testimony of two of Wendlandt's disgruntled clients, whose disastrous mortgage transactions with Wendlandt indicated an ingrained pattern of wrongdoing and predatory lending practices on Wendlandt's part. One of the borrowers, a retiree, was saddled with a balloon mortgage that carried a monthly payment of over $800, a 15.9% interest rate, settlement charges to Wendlandt of over $14,000, a loan origination fee of $6,000, and delivery costs of $1,500—all on a refinance loan for $61,000 that was substantially higher than the $51,000 remaining balance on the retiree's original loan. Faced with the

threat of foreclosure, the borrower deeded his house to the mortgage holder who, unbeknownst to the borrower, was Wendlandt's brother. Although Wendlandt told the borrower that he had thirty days to vacate the premises, the borrower was locked out of his house the next day, unable to retrieve most of his personal belongings.

The second borrower told a similar story. She testified that her financial resources were depleted as a result of Wendlandt's misrepresentations as to the terms and conditions of her loan and the related exorbitant fees, charges, and interest rate.

The sentencing record confirms that the government offered this testimony not as relevant conduct under U.S.S.G. § 1B1.3, but rather as information illustrative of Wendlandt's poor character, and that the court used the evidence for that specific § 3553(a) purpose. Although Wendlandt argues that the victims' mortgage problems were not directly attributable to him, but were caused by their own mismanagement, the district court reasonably concluded that Wendlandt's dealings with these victims, albeit not illegal per se, constituted unethical practices that reflected poorly on Wendlandt's character and supported an upward variance.

The district court also took into account the fact that seven days after Wendlandt entered his guilty plea, he applied for a mortgage payment reduction under the federal Making Home Affordable Program and signed a Dodd-Frank Certification in which he falsely represented that he did not have a felony conviction in the past ten years. The court noted that it had advised Wendlandt twice during his plea colloquy that if he pled guilty, he would be convicted of a crime.

Finally, although the district court credited Wendlandt under U.S.S.G. § 3E1.1 for his acceptance of responsibility, in varying upward it noted Wendlandt's "initial denials of wrongdoing and limited recognition of wrongdoing, and finally, . . . [g]rudging acceptance." Wendlandt maintains that this characterization is unfair, yet it is substantiated by the record, which shows that during various stages of the case, Wendlandt minimized the gravity of his conduct, attempted to blame the victims, and, during his sentencing allocution, expressed regrets for his family, but not the victims.

In light of this record, the upward variance was not substantively unreasonable, but was justified by the breadth and seriousness of Wendlandt's crime. *See United States v. Watkins*, 691 F.3d 841, 853–54 (6th Cir. 2012) (affirming a twenty-one month upward variance in light of the defendant's egregious conduct and ongoing involvement in a government bribery and corruption scandal); *Lanning*, 633 F.3d at 476 (finding no abuse of discretion in an upward variance of forty-two months of imprisonment where the defendant's applicable Guidelines range "was for the general crimes of theft or forgery, but these broad categories [did] not reflect the specific activity of repeatedly stealing individuals' checks out of their mailboxes and altering them for [the defendant's] pecuniary gain").

IV.

For the foregoing reasons, we affirm Wendlandt's sentence.