NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0535n.06

**No. 16-3825**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Sep 19, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MARTHA E. EDNIE, | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BOGGS, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Martha Ednie, a mortgage broker who assisted others in obtaining bank loans using false purchase prices, appeals her convictions for bank fraud and conspiracy to commit the same. She argues that the government failed to present sufficient evidence to establish that she knew the purchase prices were fraudulent at the time she submitted them to lenders. She also raises two challenges to her concurrent 30-month sentences, arguing that the district court erred in denying her a mitigating-role reduction and in calculating the loss amount attributable to her conduct. We hold that the government presented sufficient evidence to sustain defendant's convictions, but the district court erred in denying defendant's request for a mitigating-role reduction. We therefore affirm her convictions, vacate her sentences, and remand for resentencing.

I.

Herman "Wayne" Bradley and his son, Nick Bradley, owned dozens of rental properties in the Toledo, Ohio area. In late 2005, the two decided to sell some of them. They enlisted Tim Bradley, Wayne's other son, who was a real-estate agent, and came up with an idea to attract buyers. As an additional incentive for interested buyers, the Bradleys offered to provide cash back after closing, which the buyers could use to make repairs or spend as they pleased. To accomplish this, the buyer and seller would take the initially agreed-upon purchase price and increase it to reflect the amount of money coming back to the buyer—anywhere from $5,000 to $10,000 per property. The parties would then enter into a separate agreement (called an addendum) that memorialized the initial, lower purchase price, as well as the seller's promise to provide the buyer cash back after closing.

In many cases, the buyers needed financing, which is where defendant Martha Ednie, a local mortgage broker, came in. The Bradleys recommended that the buyers use Ednie to obtain financing. Ednie compiled pertinent information about the buyers and transactions—information such as the buyer's income, assets, and debt, as well as the terms of the sale memorialized in the purchase agreement. She submitted that information to the lenders, which then made lending decisions based on that information.

The problem with the cash-back arrangement is that everyone knew about it *except* the lenders. After the parties agreed to the cash-back proposal, the Bradleys prepared a new purchase agreement reflecting only the inflated purchase price. This was the purchase price that Ednie submitted to lenders. The parties also failed to disclose the addendums to the lenders. Ednie knew about these side agreements during the loan-application process and notarized many of them after the fact.

The Bradleys executed this scheme with at least eight different buyers and thirty-five properties over the course of nearly two years. In every case, lenders believed they were issuing loans that represented 80 to 90% of the purchase price, with the borrower providing personal funds to pay for the remaining 10 to 20%. In reality, lenders were issuing loans that often exceeded 100% of the value of the home, and a portion of the loan proceeds were being paid back to the borrower, effectively cashing out any equity stake the borrower had in the property.

The federal government eventually caught wind of the scheme and, after a lengthy investigation by the IRS, indicted Wayne, Nick, Tim, Ednie, and several others on conspiracy and various financial-crimes charges. Ednie was charged with one count of conspiracy to commit bank fraud and thirty-four counts of bank fraud, two of which were dismissed before trial. The jury found defendant guilty of conspiracy to commit bank fraud. It also found her guilty on twenty of the thirty-two counts of bank fraud and not guilty on the remaining twelve.

Before sentencing, a probation officer prepared defendant's Presentence Investigation Report (PSIR). Starting from a base offense level of 7, the probation officer increased defendant's offense level by 14 after calculating defendant's intended loss at $625,344.50. *See* U.S.S.G. § 2B1.1(b)(1)(H) (loss amount between $550,000 and $1.5 million). She arrived at this figure by compiling information for sixteen of the transactions for which defendant was found guilty and in which the lender subsequently foreclosed on the buyer. For each transaction, she subtracted the amount the lender recouped on the foreclosure sale from the initial mortgage amount. She then totaled those figures to arrive at the final loss amount of $625,344.50. That 14-level increase resulted in a total offense level of 21, which, in conjunction with a criminal-history category of I, yielded a Guidelines range of 37 to 46 months.

Defendant filed objections to the PSIR but did not challenge the loss-amount calculation. Instead, she argued that she was entitled to a four- or two-level reduction in her offense level for having a "minimal" or "minor" role under U.S.S.G. § 3B1.2. The probation officer responded that a reduction was not justified because defendant played a "vital" role in the conspiracy. The district court adopted the probation officer's response and overruled defendant's objection. Working from the 37-to-46-month Guidelines range, the district court varied downward and imposed 30-month sentences running concurrently to each other. Ednie appealed, challenging her convictions and sentences.

II.

Defendant first argues the government failed to present sufficient evidence to convict her of bank fraud and conspiracy to commit bank fraud.

We review this claim de novo, asking "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007). We must view the evidence in the light most favorable to the prosecution and refrain from reweighing the evidence or reconsidering the credibility of witnesses. *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006).

To convict defendant of bank fraud, the government had to establish that she "knowingly execute[d] . . . a scheme or artifice" "to defraud a financial institution" or "to obtain any of the moneys . . . owned by . . . a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(1), (2).

To convict defendant of conspiracy to commit bank fraud, the government had to establish "that 'two or more persons conspired, or agreed, to commit the crime of [bank] fraud' and 'that the defendant knowingly and voluntarily joined the conspiracy.'" *United States v.*

*Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (quoting Sixth Circuit Pattern Criminal Jury Instruction 3.01A); 18 U.S.C. § 1349.

Defendant argues that the government failed to show that she knew about the fraudulent purchase agreements before the loans closed, and thereby failed to establish the mens rea element for both offenses. According to defendant, the only pieces of evidence tending to establish that she "knowingly" participated in the bank-fraud conspiracy were the addendums that she notarized *after* each sale was finalized. This evidence was insufficient, she contends, because she had no duty to verify information provided by the buyer and the seller.

Defendant's argument fails for two reasons. First, it misconstrues the theory upon which she was prosecuted and convicted. Defendant claims that the basis for her guilt was her notarization of the addendums memorializing the cash-back transactions. But, as the government explains, the crime of bank fraud was complete when Ednie induced banks to make lending decisions based on false purchase-price information. *See* 18 U.S.C. § 1344. The fact that she later notarized addendums simply provided additional support for the government's contention that defendant was aware of the cash-back scheme throughout the nearly two-year conspiracy. Indeed, even defense counsel acknowledged the supporting role the notarized addendums played during his closing argument: "[M]erely notarizing an addendum[,] in the Government's eyes[,] is not enough for Martha to be charged with a crime."

Second, and perhaps more importantly, defendant's argument overlooks other evidence establishing her actual knowledge of the false purchase prices during each loan-application process. For starters, the government presented the jury with defendant's own grand-jury testimony, in which she admitted to being aware of the addendums:

Q. . . . Were you aware of these addendums yourself before the loans closed?

A. I was not.

Q. Herman Bradley never told you about that situation?

A. No.

Q. Are you sure about that, ma'am. All honesty, ma'am. This is an important point before us, and you're under oath, and this is a grand jury. This grand jury expects the truth.

*Were you aware of these side deals prior to these loans being closed with Herman Wayne Bradley or anyone associated with . . . him?*

A. *The fact that repairs were to be done and rolled into the loan amount, yes.*

Q. So you did know?

A. That repairs were going to be done.

Q. All right.

A. It was a possibility.

(Emphasis added.) And shortly before this exchange, Ednie testified that she understood the significance of failing to disclose the true purchase price and existence of the side agreements, acknowledging that "a borrower cannot roll improvements into the loan and finance improvements."

Furthermore, two of Ednie's co-conspirators testified that she knew about the addendums. Wayne Bradley told the jury that "Martha knew about the addendums, and she knew about the money going back." Asked why he thought that, he said, "Because of the conversation that me and Martha had." Nick Bradley also testified that "[s]he was aware of the addendums and aware of the money going back, and she was providing the financing for all of the buyers."

Ednie objects that Wayne's and Nick's testimony was "conclusory" and failed to establish that she knew about the scheme *before* the closings. But even accepting that their testimony was ambiguous on this point, defendant herself testified that she was aware of "[t]he fact that repairs were to be done and rolled into the loan amount" "prior to these loans being closed." The jury was free to accept this testimony, and it is not our role to second-guess the jury's credibility assessments. *Jackson*, 470 F.3d at 309. Taken together, and viewed in the light most favorable to the prosecution, this evidence was sufficient to enable any rational juror to conclude beyond a reasonable doubt that defendant had actual knowledge of the cash-back agreements before the closings. We therefore affirm defendant's convictions.

III.

Defendant also challenges the procedural reasonableness of her sentences. This court reviews a district court's sentence under the deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). "A district court commits procedural error and abuses its sentencing discretion by," among other things, "improperly calculating the Guidelines range . . . ." *United States v. Brinley*, 684 F.3d 629, 633 (6th Cir. 2012) (citing *Gall*, 552 U.S. at 51). Ednie argues that the district court miscalculated her Guidelines range in two ways. First, she contends that the district court erred in failing to grant her an adjustment for a mitigating role in the conspiracy under U.S.S.G. § 3B1.2, and, in a related vein, she argues that the district court violated Rule 32(i)(3)(B) by failing to properly rule on her objection. Second, she argues that the district court's calculation of loss amount under U.S.S.G. § 2B1.1 is not supported by a preponderance of the evidence.

A.

Section 3B1.2 of the Sentencing Guidelines authorizes a sentencing court to adjust a defendant's offense level if she had a mitigating role in the offense. Specifically, it permits a four-level reduction if the defendant was a "minimal participant," which is defined as someone who is "plainly among the least culpable of those involved in the conduct of a group"; a two-level reduction if the defendant was a "minor participant," which is defined as someone who is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal"; and a three-level reduction if the defendant falls somewhere in between. U.S.S.G. § 3B1.2 and cmt. n.4, n.5.

In her objection to the PSIR, defendant argued that a two- or four-level adjustment was warranted because she did not receive any of the financial proceeds of the conspiracy, she did not own any of the properties at issue, she did not induce buyers to join the conspiracy, and her involvement was limited to presenting loan applications to lenders. This, she argued, made her "substantially less culpable" than the average participant.

The probation officer responded that, although defendant was not the real-estate agent or owner of the properties, "her role as a mortgage broker was vital for this bank fraud conspiracy to occur." Without her, the probation officer concluded, "the other codefendants in this case would have been without a mortgage loan, or it would have been necessary for them to locate another mortgage broker to complete the transactions." The district court adopted the probation officer's response and overruled defendant's objection.

The district court erred. To be sure, this court has previously upheld similar denials on the basis that the defendant was vital or "indispensable" or "critical." *See, e.g.*, *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001) ("A defendant who plays a lesser role in a criminal

scheme may nonetheless fail to qualify as a minor participant if his role was indispensable or critical to the success of the scheme, or if his importance in the overall scheme was such as to justify his sentence."). However, in November 2015 (six months before defendant's PSIR was prepared), the Commission amended the Application Notes to clarify the application of § 3B1.2. *See* U.S. Sentencing Guidelines Manual App. C, amend. 794, at 116–18 (Nov. 2015). With Amendment 794, the Commission made clear that courts—including some in our circuit—were incorrectly denying requests for a mitigating-role adjustment on the basis that the defendant played an indispensable role in the offense. The Commission wrote: "Public comment suggested, and a review of case law confirmed, that in some cases a defendant may be denied a mitigating role adjustment solely because he or she was 'integral' or 'indispensable' to the commission of the offense." *Id*. at 118 (citing, among others, *United States v. Skinner*, 690 F.3d 772, 783–84 (6th Cir. 2012)). "However," the Commission said, "a finding that the defendant was essential to the offense does not alter the requirement, expressed in Note 3(A), that the court must assess the defendant's culpability relative to the average participant in the offense." *Id.* The Commission therefore amended the application notes to state that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3(C).

Notwithstanding the Commission's admonition in Application Note 3(C), the probation officer concluded that Ednie was not entitled to a mitigating-role reduction because "her role as a mortgage broker was vital for this bank fraud conspiracy to occur." The district court adopted this rationale verbatim. This is precisely the analysis the Commission sought to end with Amendment 794. There is no evidence that the probation officer applied the factors provided by

the Commission for evaluating mitigating-role adjustment requests, despite the fact that defendant argued that several factors supported a reduction. *See* U.S.S.G. § 3B1.2 cmt. n.3(C).

"This court gives 'Application Notes to the Sentencing Guidelines . . . controlling weight.'" *United States v. Hernandez-Fierros*, 453 F.3d 309, 313 (6th Cir. 2006) (omission in original) (quoting *United States v. Jarman*, 144 F.3d 912, 914 (6th Cir. 1998)). The district court denied defendant's request for the very reason that the Application Note instructs should not be dispositive in evaluating such a request. This constitutes legal error that requires resentencing. *See United States v. Kaminski*, 501 F.3d 655, 672–73 (6th Cir. 2007) (vacating sentence and remanding for resentencing because district court enhanced defendant's offense level in contravention of application note).

The government makes two arguments for why the district court did not commit reversible error. First, it rejects defendant's description of the district court's ruling, insisting that "the district court did not determine that Ednie's essential role rendered her categorically ineligible for the reduction." But the PSIR speaks for itself, and so does the sentencing transcript. The probation officer did not reference the five factors intended to guide a district court's decision; instead, she simply stated that "[Ednie's] role as a mortgage broker was vital for this bank fraud conspiracy." There is no other fair reading of the PSIR. And the district court merely summarized the probation officer's response before adopting it verbatim. The government's contrary arguments—that the district court relied on Ednie's repeated conduct and special role relative to other participants—are either unaccompanied by record citation or rely on an unrelated portion of the sentencing hearing.

Second, the government shifts to the merits, arguing that defendant is not entitled to a reduction because, even under the proper legal standard, she is not substantially less culpable

than other participants. This argument is misplaced. Whether a defendant is entitled to a reduction under the five-factor standard provided in Application Note 3(C) is a fact-intensive question that district court judges are best equipped to resolve in the first instance. *See* U.S.S.G. § 3B1.2 cmt. n.3(C) ("The determination whether to apply [§ 3B1.2] is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."). Because defendant preserved this claim below, she need not demonstrate to this court that the error affected her substantial rights (*i.e.*, that she is, in fact, entitled to the reduction, resulting in a lower Guidelines range); on these facts, she is entitled to have the district court rule on the issue in the first instance.

In sum, the district court committed a legal error in overruling defendant's objection for a reason explicitly disavowed by the Guidelines Application Notes. An error of law is necessarily an abuse of discretion, *see Koon v. United States*, 518 U.S. 81, 100 (1996), and the district court is better positioned to decide whether defendant is substantially less culpable than the average participant using the five factors in Application Note 3(C). We therefore vacate defendant's sentences and remand for resentencing.[1]

B.

Defendant also argues that the district court erred in calculating the loss amount attributable to her under U.S.S.G. § 2B1.1.

"We review a district court's calculation of the 'amount of loss' for clear error, but consider the methodology behind it *de novo*." *United States v. White*, 846 F.3d 170, 174 (6th Cir. 2017) (quoting *United States v. Meda*, 812 F.3d 502, 519 (6th Cir. 2015)). "In order to

---

[1]In light of our decision, it is unnecessary to address defendant's argument that the district court violated Rule 32 by failing to make factual findings relating to the five factors listed in Application Note 3(C).

challenge this calculation, [the defendant] must carry the burden of demonstrating that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations." *Id.* (alteration in original) (quoting *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009)). Because she failed to object to the loss calculation below, defendant bears the additional burden of satisfying the plain-error standard, which requires that she show: (1) error, (2) that was clear or obvious, (3) that affected her substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732–36 (1993).

Section 2B1.1 of the Sentencing Guidelines requires a district court to increase a defendant's offense level based on the amount of monetary loss attributable to his or her offenses. *See* U.S.S.G. § 2B1.1. This court takes a two-step approach to determining loss amount in mortgage-fraud cases. *United States v. Wendlandt*, 714 F.3d 388, 393–94 (6th Cir. 2013). In step one, the court must calculate the total loss, using the greater of "actual loss" or "intended loss." *Id.* at 393 (citing U.S.S.G. § 2B1.1 cmt. n.3(A)). "Intended loss" means "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(i), with "reasonably foreseeable pecuniary harm" defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense,'" U.S.S.G. § 2B1.1 cmt. n.3(A)(iv). To attribute an actual loss to a defendant, his or her conduct must be both a "but for" cause and a proximate cause of the loss. *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004). In step two, "the district court must reduce the loss by the amount of money the victim recovered by selling the

collateral, or the fair market value of the property at the time of sentencing if the victim has not disposed of the collateral." *Wendlandt*, 714 F.3d at 394 (citing U.S.S.G. § 2B1.1 cmt. n.3(E)(ii)).

Defendant first argues that, insofar as the $625,344.50 figure represents "intended loss," there is no evidence to suggest that she "purposely" intended for lenders to lose a substantial portion of the loans through foreclosure. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). The government does not contest this assertion, but argues instead that $625,344.50 represents the "actual loss" from defendant's conduct. However, the PSIR (which the district court adopted without comment or alteration) explicitly states that "the *intended* loss is $625,344.50." (Emphasis added.) Because the record establishes that the 14-level increase in defendant's offense level was based on "intended" loss, and because the government makes no argument to support the 14-level increase under that standard, the government has effectively conceded error on this point.

Normally, we would next turn to the question whether the error was obvious and affected defendant's substantial rights. However, because we are vacating defendant's sentences and remanding for resentencing, there is no need to do so. The parties can argue the loss-amount issue before the district court on remand.

## IV.

For these reasons, we affirm defendant's convictions, vacate her sentences, and remand for resentencing.