NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0617n.06
Filed: August 22, 2006

**No. 05-5902**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,                  )
                                           )
    Plaintiff-Appellee,                    )
                                           )
v.                                         )  ON APPEAL FROM THE UNITED
                                           )  STATES DISTRICT COURT FOR
                                           )  THE EASTERN DISTRICT OF
CHESTER C. CALKINS,                        )  KENTUCKY
                                           )
    Defendant-Appellant.                   )

_____

Before:  SILER and ROGERS, Circuit Judges; JORDAN, District Judge.[*]

    **SILER**, Circuit Judge.  Defendant Chester C. Calkins appeals from his sentence of 46 months' imprisonment pursuant to a plea of guilty to aiding and abetting bank fraud.  Calkins and his spouse operated a scheme whereby they sold condominiums and received payment from the purchasers.  Calkins represented to the purchaser that the mortgage on the sold condominium unit would be paid but instead intentionally led his creditors to believe that no sales had occurred, so as to dely repayment of the obligation.  The district court found that Calkins intended losses of approximately $4.9 million to the various lending institutions.  Because the district court did not reduce Calkins's amount of loss by the amount of collateral securing each loan, we VACATE the

_____

    [*]The Honorable Leon Jordan, United States District Judge, Eastern District of Tennessee, sitting by designation.

sentence and REMAND to the district court to consider whether the loss should be reduced by the amount of collateral in accordance with USSG § 2B1.1.

## FACTS

In 2005, an information was filed charging Calkins and Antoinette M. Calkins, his spouse, with aiding and abetting bank fraud. 18 U.S.C. §§ 1344 and 2. The information alleged that he diverted funds as part of a larger scheme and artifice to defraud a number of banks by delaying repayment, beginning in 1999 and continuing until 2002. The scheme involved 47 condominiums and approximately $4,983,991.85 in closing proceeds that were not forwarded to the banks for satisfaction of their construction loans immediately upon sale as contractually required. Calkins was required to pay a certain amount for each unit as it was sold. The following example is provided to illustrate the scheme: Calkins failed to pay Huntington National Bank $75,565, the apportioned amount of a construction loan (or mortgage) on 532 Fawn Run Drive, at the time of the sale of the unit, instead, diverting the funds to a business run by Calkins, Homes by Calkins, Inc. ("HBC"), and for his personal use.

Calkins was the sole stockholder of HBC, a residential building contractor. HBC financed the construction of these sites with loans from the banks. Under the terms of the construction loans, HBC was required at the time of closing to pay off the portion of the loan that was associated with the unit that was being sold. The typical apportioned amount of the construction loan (or the mortgage) was 75% to 90% of a unit's contract or sale price. If a unit was not sold, the loans were not due; thus Calkins could dely repayment by concealing sale until a later time.

From 1999 through 2002, HBC sold 47 units to individuals who paid cash for their units. Upon the sale of the units, enabling Calkins to conceal the sales from the banks. Calkins failed to pay off the apportioned amount of the construction loans, resulting in the purchaser's unknowingly taking possession of the unit with an attached lien. As a result, Calkins delayed repayment of $4,983,991.85.

Huntington National Bank discovered Calkins's fraud in 2002 when HBC's loans became delinquent. The bank learned that Calkins had conveyed ten properties and received payment without paying down the construction loans at the time of closing. In fact, at the time the bank discovered the scheme, Calkins delayed paying any debt. Calkins later repaid some of the debt and as of the date of sentencing he had paid all but approximately $300,000 of the debt owed.

Calkins and his spouse pleaded guilty and agreed to the recommended base offense level of 6. The parties also stipulated that the relevant conduct was $4,983,991.85. Calkins, however, reserved the right to argue at sentencing for a reduction in the base offense level under Application Note 2(E)(ii) to USSG § 2B1.1. As discussed below, the Guidelines permit a district court to reduce a defendant's losses based upon the value of pledged collateral.[1]

---

[1]  USSG § 2B1.1, comment. (n. 2E):

Loss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or a government agency. (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered

Prior to sentencing, Calkins objected to the Presentence Report's (PSR) calculation of loss at $4,877,469.85 and resulting 18-level increase under USSG § 2B1.1(b)(1)(J).[2] The PSR also recommended a two-level increase in the offense level because Calkins derived more than $1,000,000 in gross receipts from one or more banks as a result of his offense, and a three-level reduction for timely acceptance of responsibility. Thus, his total offense level was 23, subjecting him to a guideline range of 46 to 57 months. Calkins objected and argued that under Application Note 2(E)(ii), a credit against the loss should be taken to reflect the full collateralization of each bank's construction loan including the following: (1) a first security interest in the entire condominium project; (2) a pledge of all assets of HBC; and (3) a pledge of all of Calkins's personal assets.

Calkins outlined his version of the liquidation of the construction security interests and notes held by each of the banks and calculated loss at the time of sentencing as $331,892.50. According to his calculations, a loss figure between $200,000 and $400,000 would result in a 12- level increase under USSG 2B1.1(b)(1)(G) with a total offense level of 17. The sentencing range would then be 24 to 30 months.

At sentencing in 2005, the district court found that it was difficult to determine the collateral pledged under the construction loans. It asked if it was required to determine the fair market value

---

at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

[2] The following mortgage amounts were associated with the 47 individual condominium units sold as they relate to each bank: Huntington Bank, $952,146; Bank of Kentucky, $1,271,055; Provident Bank, $586,765; U.S. Bank, $664,422; and Bank One, $1,403,081.85.

of the collateral at the time of sentencing and indicated that it did not have any information about that. The district court ultimately rejected Calkins's request for a reduction under Application Note 2(E)(ii) to Section 2B1.1 due to his intent not to repay the loan and the consideration that calculating loss amounts at the time of sentencing would reduce Calkins's culpability. It found that "[t]he amount of loss should be determined as it exists at the time of its detection rather than [sentencing]."

The district court concluded with the findings that (1) it must consider the greater of the actual or intended loss, which was approximately $4.9 million; (2) Application Note 2(E)(ii) does not apply where the banks' losses are reduced from any source other than the sale or return of the 47 mortgaged properties; and (3) Application Note 2(E)(ii) does not apply because the collateral itself was part of the fraudulent scheme and not intended to reduce the amounts defrauded. It sentenced Calkins to 46 months and ordered payment of $437,173.17 in restitution.

## STANDARD OF REVIEW

This court reviews *de novo* a sentencing court's resolution of whether collateral should be considered when determining intended loss. *United States v. Katzopoulos*, 437 F.3d 569, 574 (6th Cir. 2006). However, factual determinations with respect to the sentencing guidelines are reviewed for clear error. *United States v. Ables*, 167 F.3d 1021, 1035 (6th Cir. 1999).

## ANALYSIS

After the decision in *United States v. Booker*, 543 U.S. 220 (2005), a district court is not obligated to impose a sentence within the Sentencing Guidelines' range. Nevertheless, the advisory Guidelines range must be consulted in selecting an appropriate sentence. *See United States v.*

*Williams*, 411 F.3d 675, 678 (6th Cir. 2005). Thus a district court must accurately calculate the sentencing range called for by the Guidelines. *United States v. Jones*, 445 F.3d 865, 869 (6th Cir. 2006). We are to determine whether the district court's loss calculations were correct or whether they should be reduced by the amount of any collateral pledged.

Calkins argues that he should be resentenced because each bank held a first security interest in the entire condominium construction project, including any unsold units. He claims that the banks holding a security interest in the entire condominium project mitigated their losses when they sold the loans. Specifically, Huntington Bank, Provident Bank, and Bank One reduced their losses when they sold their construction notes and liens to third parties. Calkins reasons that the sale of the loans was the disposition of collateral and a reduction of each bank's losses and that the banks were never in danger of failing to locate the collateral securing their loans. Thus, he concludes that the district court should not be allowed to assume that he intended the maximum possible loss when Calkins did not intend to conceal collateral.

Loss is defined as the "greater of actual loss or intended loss." USSG § 2B1.1 comment. (n. 2). While "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," "intended loss" is "the pecuniary harm that was intended to result from the offense," including the "intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* We usually defer to the loss calculation of the district court because it is "in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.*

The district court erred in concluding that the defendant's intended loss, *i.e.*, his intent not to pay off the construction loans, would eliminate an offset for pledged collateral. *See, e.g., United States v. Wright*, 60 F.3d 240, 241 (6th Cir. 1995) (holding loss amount should be reduced by assets pledged to secure the loan). First, the commentary mandates that if the loan involves "collateral pledged," then the loss amount *shall* be reduced by the victim's recovery "at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." USSG § 2B1.1 comment. (n. 2) (emphasis added). The district court found that Calkins intended to permanently deprive the banks of the collateral. However, the banks were never in any danger of losing the underlying collateral, which was secured by the condominium units.

In *United States v. Weidner*, 437 F.3d 1023, 1048-49 (10th Cir. 2006), the court required that "the value of security given for a loan be taken into account in determining intended loss." *Id.*, citing *United States v. Schild*, 269 F.3d 1198, 1201 (10th Cir. 2001). It further reasoned that "[t]he security of [a] loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss." *Id.,* quoting *United States v. Nichols*, 229 F.3d 975, 980 (10th Cir. 2000). The Tenth Circuit concluded that the district court did not adequately consider the amount of collateral provided by the defendant under the intended loss theory.

Under the intended loss theory a court may decline to reduce the intended loss by the collateral pledged where the district court finds that the defendant intended to deprive the lender of its collateral. Such a finding has been supported where the defendant conceals the collateral. *See United States v. Williams*, 292 F.3d 681, 686 (10th Cir. 2002) ("[W]e have upheld a finding of

intended loss of an entire loan amount where the record indicated the defendant intended to permanently deprive the lender of security by concealing pledged collateral."). This case is also distinguishable from *United States v. McCormac*, in which the Ninth Circuit held that difficulty locating an automobile for repossession indicated intent to permanently deprive the lender of secured collateral. 309 F.3d 623, 628-29 (9th Cir. 2002). In this case, the district court's conclusion that the loans may go into default does not support the finding that Calkins intended to conceal the collateral. We discern no way in which Calkins could conceal the collateral, either the loans, as the banks' assets, or the condominiums, as secured collateral. We do not conclude that in all instances such collateral could not be concealed, but the facts in this case indicate that the banks had knowledge of the precise location of the condominium units. Moreover, there is no district court finding that Calkins intended to prevent or could have prevented the unsold condominiums from reverting to the lender.

We held in *United States v. Quigley* that the district court should have reduced the loss amount by an amount recovered by "reason of the cross-collateralization agreement." 382 F.3d 617, 622-23 (6th Cir. 2004) (although this case evolved under USSG § 2F1.1(b)(8)(B) for loss exceeding $1.5 million, we view it as persuasive authority since those provisions have been incorporated into USSG § 2B1.1). In *Quigley*, the defendant through his mortgage company borrowed funds and improperly used them for purposes other than satisfying closing costs. *Id.* at 619. We calculated loss by the amount of loans sold by the defrauded bank. *Id.* at 623. We reasoned, as we also do here, that the defendant did not intend to deprive the lender of the entire loss amount when the bank knew "with absolute certainty, that [the bank] had a fully-enforceable security interest in that amount as

the proceeds from the sale of the underlying loans." *Id.* Nevertheless, in this case the record is not sufficient to permit us to calculate a correct loss amount. In addition, we cannot discern whether only the 47 condominiums secured the loans or whether the entire condominium project, including unsold condominiums, secured individual banks' loans.

Upon remand, the district court should determine whether the sales of the construction loans held by the banks were disposed collateral warranting a reduction in the loss calculation. In addition, we cannot discern whether U.S. Bank sold its loan or disposed of any of the underlying collateral. The district court should consider whether to credit any losses for the presentencing sales of additional units that were not involved in the fraud. Calkins also suggests that U.S. Bank and Bank of Kentucky held collateral that was not disposed of at the time of sentencing and the calculation of loss should be reduced by its fair market value. Moreover, the district court should take account of any personal assets of Calkins that were pledged as collateral. Lastly, in calculating "the fair market value of the collateral at the time of sentencing," the district court should consider any unreleased liens on the homes for which cash was paid.

We reject Calkins's argument that previously unsecured personal payments or payments from third parties should count as collateral. First, the application note is clear that only disposition of collateral or the fair market value of any unsold collateral reduces the loss amount. In addition, we held in *United States v. Scott*, 74 F.3d 107, 112 (6th Cir. 1996), that subsequent voluntary restitution is not the same as posting collateral. A "defendant in a fraud case should not be able to reduce the amount of loss for sentencing purpose by offering to make restitution after being caught." *United States v. Mummert*, 34 F.3d 201, 204 (3d Cir. 1994).

No. 05-5902
*United States v. Calkins*

  We VACATE the sentence and REMAND for further resentencing.