**NOT RECOMMENDED FOR PUBLICATION**
File Name: 10a0667n.06

No. 09-1464

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Oct 29, 2010** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Aubrey Terbrack, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:    MERRITT, ROGERS, SUTTON, Circuit Judges.

**MERRITT, Circuit Judge**.    Aubrey Terbrack, a mortgage lender, appeals his prison sentence of 78 months for wire fraud.  Like the district court, we are faced with a time-consuming accounting task of determining which of two overlapping ranges of the Federal Sentencing Guidelines is "applicable," *see* U.S.S.G. § 1B1.1, both of which allow a 78-month sentence. Terbrack's principal Sentencing Guidelines argument is that the district court, when estimating the amount of "loss" caused by his fraud pursuant to the Guidelines, failed to "credit" certain items as "collateral."  These items, however, are not collateral within any meaning of that term.  Accordingly, we affirm.

**I.**

Terbrack's fraud arose from his mortgage-loan business. He owned and operated Marathon Financial Corporation ("Marathon"), which originated and serviced mortgage loans. Those loans were guaranteed by the Government National Mortgage Association ("Ginnie Mae"). Marathon was obligated to file reports with Ginnie Mae each month, as well as when borrowers paid off their loans.

The fraud began in July 1998, when Terbrack began diverting mortgage-payoff proceeds to a separate Marathon account over which he had control. To cover up these diverted funds, he falsified his reports submitted by wire communication to Ginnie Mae. In October 2007, Ginnie Mae discovered the fraud through an internal audit. It immediately declared Marathon in default and acquired all of Marathon's loans. Of the more than two thousand loans that Marathon serviced, only about two hundred were involved in the fraud. Ginnie Mae held all of Marathon's loans on its books for several months as it tried to identify the fraudulent ones. When it eventually liquidated the loans, Ginnie Mae estimated its losses at over $22 million.

The government charged both Terbrack and his confederate, Denise Money, with wire fraud. Money was a vice president and an office manager of Marathon, and she was intimately involved in perpetrating the mortgage-fraud scheme. Aside from receiving her regular paycheck, however, Money did not benefit from the fraud; she did not receive any of the diverted funds. Moreover, when Ginnie Mae first uncovered the fraud, Money provided Ginnie Mae with assistance in determining precisely which loans in Marathon's portfolio were fraudulent. Both Terbrack and Money pled guilty. In Terbrack's plea agreement, he agreed not to directly appeal the district court's "adverse

determination of any disputed sentencing issue" unless it was raised "at or before the sentencing hearing."

The district court conducted an evidentiary sentencing hearing for Terbrack and Money. At the hearing, the predominant issue was whether the fraud caused more than $20 million in loss to Ginnie Mae. All parties agreed that the preliminary estimate of loss should be $21,578,095, but they differed on the amount of credits that should apply. Terbrack presented seven items for this purpose: (1) the net value of one of Marathon's escrow accounts, (2) Ginnie Mae's "carrying costs" caused by its delay in liquidating Marathon's loans, (3) a $760,000 settlement that Marathon had received from a title company, (4) an allegedly misdirected check worth $707,180, (5) "cash on hand" when Marathon petitioned for bankruptcy (in an amount of either $1.2 million or $986,000), (6) the value of servicing Marathon's loan portfolio, and (7) a $750,000 fidelity bond posted by Marathon.

The district court chose to credit the first two items. It found that the escrow account should be credited,[1] and it estimated its net value at $287,000. It also found that Ginnie Mae's carrying costs should be credited,[2] and it valued those at $346,427. But it rejected the remaining items. Its final estimate of loss was therefore $20,944,619. Because this estimate of loss exceeded $20

---

[1]The government conceded at the evidentiary hearing that the escrow account was collateral, such that it should serve as a credit under U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). The parties do not contest on appeal whether the escrow account is collateral.

[2]The district court indicated that the carrying costs qualified as interest under U.S.S.G. § 2B1.1 cmt. n.3(D)(i), which provides that loss shall not include "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." The idea is that Marathon should not be penalized for the time value of money over the time that Ginnie Mae held the loans before liquidating them.

million, the district court increased Terbrack's Guidelines offense level by 22. If it had estimated

the loss at between $7 million and $20 million, his Guidelines offense level would have increased

instead by only 20. *See* U.S.S.G. § 2B1.1(b). This two-level difference caused Terbrack's

Guidelines sentencing range to be 78 to 97 months, rather than 63 to 78 months. The district court

sentenced Terbrack to 78 months. It sentenced Money to one day in prison, followed by six months

in a supervised reentry center and six months of home confinement. Terbrack appealed.

## II.

Terbrack requests to be resentenced for two reasons. First, he argues that the district court

did not properly credit all items that would reduce its estimate of loss under the Guidelines to less

than $20 million. Second, he argues that the disparity in length between his sentence and Money's

sentence violates the Guidelines. For the following reasons, both arguments fail.

**A.      The District Court Properly Estimated the Loss Caused by Terbrack's Fraud**

The district court "is in a unique position to assess the evidence" and "need only make a

reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). Accordingly, we may not overturn

its factual findings unless they are clearly erroneous. *United States v. Triana*, 468 F.3d 308, 321 (6th

Cir. 2006). When the question involves the application of a Guidelines provision to a set of facts,

however, we review de novo. *United States v. Wolfe*, 71 F.3d 611, 616 (6th Cir. 1995).

Application Note 3(E)(ii) instructs that loss "shall be reduced" by the value of any collateral.[3] U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). Specifically, it provides that "[i]n a case involving collateral pledged or otherwise provided by the defendant," the court must credit "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." *Id.*

A threshold requirement to invoke this provision is that an item constitute "collateral." Neither the Guidelines nor its Application Notes define this financial term. Collateral generally implies the existence of a security interest held by a creditor in property owned by a debtor. *See, e.g.*, Black's Law Dictionary 218 (8th ed. 2005) (defining collateral as "[p]roperty that is pledged as security against a debt; the property subject to a security interest or agricultural lien"). Other circuits that have construed Application Note 3(E)(ii) have used a traditional definition of collateral. *See, e.g.*, *United States v. Dullum*, 560 F.3d 133, 139 (3d Cir. 2009) ("Based on a common sense reading of the Application Note's straightforward language, however, we believe the correct interpretation limits its application to situations involving a traditional notion of collateral.") (collecting cases).

Terbrack presents five items on appeal that he argues are collateral: (1) a $760,000 settlement that Marathon had received from a title company, (2) an allegedly misdirected check

---

[3]The Application Notes to § 2B1.1 create two coequal classes that effectively serve as credits against loss: "exclusions" under Application Note 3(D) and "credits" under Application Note 3(E). In turn, there are two types of exclusions and two types of credits. U.S.S.G. § 2B1.1 cmt. n.3. Of these four types of credits, the only one that arguably applies in this case is the one for collateral under Application Note 3(E)(ii).

worth $707,180, (3) a $750,000 fidelity bond, (4) "cash on hand" when Marathon petitioned for bankruptcy (of either $1.2 million or $986,000), and (5) the value of servicing Marathon's loan portfolio.[4] His theory is essentially the same for each: Marathon's regulatory and contractual relationship with Ginnie Mae caused all of Marathon's assets to constitute Ginnie Mae's collateral because Ginnie Mae could proceed against any of them in court. He points to a federal regulation permitting Ginnie Mae "to proceed against other assets of the issuer" when mortgage issuers, like Marathon, default. 24 C.F.R. § 320.31 (2010). He also points to a guaranty contract between Ginnie Mae and Marathon, which provides that upon Marathon's default, Marathon "shall automatically give up and forfeit, and hereby release to Ginnie Mae, all of its right, title, and interest" to any and all assets and proceeds "related in any way to the Mortgages."

Terbrack's argument, however, requires an excessively broad definition of collateral. Although the guaranty contract requires Marathon to "forfeit" and "release" its assets to Ginnie Mae upon default, it does not grant Ginnie Mae a security interest in those assets; it merely gives Ginnie Mae legal grounds should it decide to litigate. Terbrack's argument implies that all assets owned by a debtor should be considered "collateral" for a debt whenever an unsecured creditor, such as Ginnie Mae here, could litigate to recover them. Such a definition is broader than any common

---

[4]Ginnie Mae had not received any of the first four items by the time Terbrack was sentenced. (Indeed, although it is not relevant to our analysis, the government revealed at oral argument that Ginnie Mae *still* had not received any money from these items from Marathon's bankruptcy proceeding as of October 15, 2010.) As for the fifth item, Ginnie Mae possessed Marathon's loan portfolio, but the right to service it was arguably valueless because no investor would purchase loans from a tainted portfolio. The district court apparently agreed. Regardless, we find that these rights are not collateral under Application Note 3(E)(ii), so they cannot serve as a credit against loss even if they had value.

understanding of that term; in fact, Terbrack's counsel at oral argument conceded that assets in a hypothetical defendant's bank account that are unrelated to a fraud do not become collateral simply because the victim could pursue them in litigation. Unsurprisingly, the cases Terbrack cites in his brief provide no authority for his proffered definition.[5] Accordingly, we uphold the legal conclusion of the district court that none of these five items are collateral within the meaning of Application Note 3(E)(ii). The district court was correct not to credit any of them against its estimate of loss.

Terbrack next urges us to reverse the district court's factual finding regarding the value of an item that it did credit—Marathon's escrow account. Terbrack asserts that this account had a value of $825,197, rather than the $287,049 credited by the district court. Even if we found that the account should be valued at the greater amount, it would not suffice to reduce the loss estimate from $20,944,619 to below $20 million. But regardless, this finding by the district court was not clearly erroneous. A Ginnie Mae employee testified at the evidentiary hearing that the net value of the escrow account, after subtracting other obligations, was $287,049. We have reviewed Terbrack's

---

[5]In *United States v. Wells*, which construed a comparable Application Note in the Guidelines regarding estimation of loss, the Eighth Circuit affirmed the district court's crediting of the value of a stream of payments that the defendant's company had assigned to its victims. 127 F.3d 739, 748–49 (8th Cir. 1997). Although those payments were assigned rather than pledged to the victims, the court reasoned that this technical distinction was inapposite because the victims were protected under the Uniform Commercial Code to the same extent as if a pledge had occurred. *Id.* at 749 & n.3. No similar assignment occurred here. Terbrack also cites *United States v. Calkins*, 193 F. App'x 417 (6th Cir. 2006). But in that case, the victim possessed a security interest in the condominium units that the court held to be collateral. *Id.* at 419–22. And the court expressly rejected the defendant's argument—comparable to Terbrack's argument here—that "previously unsecured personal payments or payments from third parties should count as collateral." *Id.* at 422.

spreadsheet exhibit entitled "Corrected GNMA Liquidation Report" and do not believe that it renders the district court's finding, which was based on uncontroverted testimony, to be clearly erroneous.

In sum, none of the five items listed above constitutes collateral under Application Note 3(E)(ii). Nor did the district court clearly err in estimating the value of the credited escrow account to be $287,049. Accordingly, the district court properly estimated the amount of loss at $20,944,619 and sentenced Terbrack within the correct Guidelines range.

**B.     The District Court Did Not Abuse Its Discretion Due to the Sentencing Disparity**

Terbrack argues that the district court abused its discretion when it sentenced him to a significantly longer term of imprisonment than his confederate, Denise Money. Terbrack received 78 months; Money, on the other hand, received imprisonment of one day, followed by six months in a supervised reentry center and then six months of home confinement. Terbrack did not object to this disparity at the time of sentencing, so the government counters that Terbrack waived this argument pursuant to the appeal waiver in his plea agreement. Terbrack responds in turn that he could not object because Money was sentenced several minutes after he was.

Assuming without deciding that Terbrack did not waive his right to appeal by failing to object at the sentencing hearing, the district court did not abuse its discretion in ordering these disparate sentences. Although the Guidelines require the district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), that provision is said to be concerned with national disparities, not those between co-defendants, *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007). A district court *may* exercise its discretion to determine a defendant's sentence in light

of a co-defendant's sentence. *Id.* But in the instant case the district court was well within its discretion not to do so. Terbrack was the leader of the mortgage-fraud scheme, owned Marathon, and converted the proceeds of the fraud to his own use. None of this was true of Money. Moreover, the government moved for a substantial assistance downward departure for Money, but not for Terbrack. The district court was therefore within its discretion in sentencing Terbrack and Money to disparate sentences.

**III.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.