RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 12-4288

JASEN SNELLING,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:12-cr-00058—Herman J. Weber, District Judge.

Decided and Filed: September 22, 2014

Before: BOGGS and ROGERS, Circuit Judges; and STEEH, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge. Defendant-Appellant Jasen Snelling appeals a 131-month prison sentence imposed pursuant to a plea agreement. In the agreement, Snelling admitted to charges of conspiracy to commit mail and wire fraud, obstruction of justice, and tax evasion for his part

---

[*] The Honorable George C. Steeh, United States District Court for the Eastern District of Michigan, sitting by designation.

1

in an investment scheme that defrauded investors of nearly $9 million. Snelling challenges the sentence based on an allegedly faulty Guidelines-range calculation that employed a loss figure that did not take into account the sums paid back to his Ponzi scheme's investors in the course of the fraud.

For the reasons below, we vacate the sentence of the district court and remand the case for resentencing.

I

In June 2012, Snelling was named in an information for his part in a Ponzi scheme that defrauded investors by soliciting funds for two fictitious financial companies, CityFund and Dunhill. These companies supposedly invested their clients' money in overseas mutual funds and overnight depository accounts, activities that promised investors an annual return of 10–15%. In reality, Snelling and his partner operated a Ponzi scheme in which the "returns" on earlier investors' capital were simply a portion of new investors' deposits. The remainder of the new deposits were diverted to Snelling and his partner. The two of them used the money to buy vacation houses and boats, pay private-school tuition, and otherwise live extravagantly. Among the various tactics employed by the scheme were the intentional targeting of victims' IRA and 401(k) accounts, the issuance of false quarterly statements by mail and, when confronting their investors' suspicions, the production of false trading-account records. They also provided false documents, including the falsified trading-account statements, to a federal grand jury. Those documents reflected a balance of $8.5 million in CityFund / Dunhill's account when, in fact, it held just $995.88. Neither Snelling nor his partner paid taxes on the diverted funds.

The information contained three counts: conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; obstruction of justice, in violation of 18 U.S.C. §§ 1519 and 2; and tax evasion, in violation of 18 U.S.C. § 7201. Snelling signed a plea agreement, admitting all three of the charges in the information. The plea agreement contained reference to the very dispute that is at issue in this case: the parties' divergent offense-level calculations for the charge of mail and wire fraud. Depending upon the loss figure established at sentencing, different subsections of U.S.S.G § 2B1.1(b)(1), corresponding to different offense-level enhancements, would

apply. The plea agreement indicated that it was Snelling's position that he should receive credit for money returned to the victims during the scheme.

The probation office prepared a Presentence Investigation Report (PSR), which calculated the sentencing-guidelines range for the charge of mail and wire fraud according to the method proposed by the government in Snelling's plea agreement. That calculation reflected a total loss figure of over $7,000,000, which, in turn, yielded an offense-level enhancement of 20 levels under U.S.S.G. § 2B1.1(b)(1)(K). The PSR, like the plea agreement, duly recorded Snelling's objection to the government's calculations as well as his different reading of the Guidelines, which would have yielded a loss figure of less than $7,000,000, based on the Guidelines' requiring the deduction of sums returned to investors in the course of a fraud. Snelling also objected to the PSR's Guidelines calculation in a sentencing memorandum. The government filed a memorandum in response in which it held firm to the offense-level calculation set forth in the plea agreement and in the PSR, arguing that Snelling "should not get credit for payments to perpetuate the scheme made with other victims' money."

At sentencing, Snelling again stated his reading of the U.S.S.G. The district court rejected Snelling's argument. Echoing the government's memorandum, the court stated that "the loss should not be reduced, particularly because the monies did not represent profits . . . any return of money was to induce further investment . . . ."

In the end, the court settled on a loss figure that was based on the intended loss of $8,924,451.46, a figure that resulted in the application of U.S.S.G. § 2B1.1(b)(1)(K) and its attendant offense-level increase of 20. This led to a total offense level of 35 for the charge of mail and wire fraud. The court also calculated an offense level of 19 for the charge of obstruction of justice and an offense level of 22 for the charge of tax evasion. With a three-level reduction applied for Snelling's acceptance of responsibility, the court settled on a final offense level of 32 and a criminal history category of I. This calculation resulted in a sentencing range of 121–151 months, significantly higher than the range of 97–121 months claimed by the defense. The court ultimately sentenced Snelling to 131 months' of imprisonment, to be served concurrently with the Indiana prison sentence already imposed, and to be followed by three years of supervised release. Snelling timely appealed the sentence.

II

"Criminal sentences are reviewed for both substantive and procedural reasonableness." *United States v. Stewart*, 628 F.3d 246, 257 (6th Cir. 2010). Substantive reasonableness is concerned with the length of a sentence in context, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *United States v. Novales*, 589 F.3d 310, 314 (6th Cir. 2009). Procedural reasonableness, on the other hand, is concerned with the method by which the court arrives at the sentence. For a sentence to be procedurally reasonable, the court "must properly calculate the Guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors and adequately explain the chosen sentence . . . ." *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008). Snelling does not challenge the substantive reasonableness of his sentence; his appeal focuses on procedural reasonableness—whether the district court calculated the Guidelines range correctly.

As for the loss figure applied in calculating the Guidelines range, we review the district court's determination for clear error. *See United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002). However, "[w]hether those facts as determined by the district court warrant the application of a particular guideline provision is purely a legal question and is reviewed de novo." *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004).

III

Snelling's appeal calls into question the district court's calculation of his Guidelines range. He objects that the loss figure should have been reduced from $8,924,451.46, the total amount of money taken in by the Ponzi scheme from its investor victims, to $5,336,187.78, to account for the total amount returned to investors over the life of the fraud. The difference between the two figures leads to the application of different sub-sections of U.S.S.G. § 2B1.1(b)(1). Losses over $7,000,000 require the application of § 2B1.1(b)(1)(K), which calls for an offense-level increase of 20 levels. Losses under $7,000,000, on the other hand, require at most the application of § 2B1.1(b)(1)(J) and an attendant increase of 18 levels. At sentencing, the application of these two provisions to a criminal history category of I yields two disparate ranges: 121–151 months and 97–121 months, respectively.

Basing his argument squarely on the text of the guidelines, Snelling's reasoning runs as follows:  First, the loss figure attributable to any fraud is the greater of either the actual loss (the "reasonably foreseeable pecuniary harm that resulted from the offense"), or the intended loss ("the pecuniary harm that was intended to result from the offense").  U.S.S.G. § 2B1.1 Application Note 3(A).  This rule produces a loss figure of $8,924,451.46, the total amount of money received from the victim-investors over the life of the fraud.  This was the sum identified by the government in its information and was the sum set forth in its sentencing memorandum.

Second, Application Note 3(E), "Credits Against Loss," requires that the "[l]oss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned, and the services rendered, by the defendant . . . to the victim before the offense was detected."  U.S.S.G. § 2B1.1 Application Note 3(E)(i).  Snelling reads this to require that the $8,924,451.46 figure be reduced by the total amount of money returned to the investor victims through the course of the Ponzi scheme—approximately $3.6 million.  This figure is identified in the PSR as the amount of restitution owed:  $5,336,187.78.

Third, because Snelling's figure of $5,336,187.78 is under $7,000,000, the court should have applied § 2B1.1(b)(1)(J), which calls for an offense-level increase of 18 levels instead of the government calculation's increase of 20 levels.

Snelling's argument, based on the text of the Guidelines alone, is persuasive.  His reading of the Guidelines is further bolstered by U.S.S.G. § 2B1.1 Application Note 3(F)(iv), which specifically addresses Ponzi-scheme loss calculations.  Application Note 3(F)(iv) states that, when calculating the loss figure in a Ponzi scheme, the "loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment."  U.S.S.G. § 2B1.1 Application Note 3(F)(iv).  Snelling argues that the language of this note implies that courts are expected to reduce loss figures by the sums returned to investor victims, and that the note seeks to limit such reduction to *no more* than the principal invested.  Thus, the Sentencing Commission, while contemplating that loss figures should be reduced according to the amount of money returned, does not want a single investor's returns to be deducted beyond the amount originally invested:  "[T]he gain to an individual investor in the scheme shall not be used to offset the loss to another."  U.S.S.G. § 2B1.1

Application Note 3(F)(iv).   Again, Snelling's argument is persuasive.   The fact that the Application Notes limit deductions from loss figures to no more than the sums originally invested implies, quite strongly, that the loss figures are to be reduced in the first place.

Further evidence supporting Snelling's position comes from the history of the Guidelines. The 2001 edition of the Guidelines contained entirely re-written provisions covering sentencing enhancements based on the magnitude of the losses caused by fraud.   The pre-2001 provision, § 2F1.1, contained language similar to the current provision, in that it called for an offense-level enhancement that increased with the size of the loss suffered by the fraud's victims.   U.S.S.G. § 2F1.1(b)(1) (2000).   The loss figure that courts were to apply was based on the "value of the money, property, or services unlawfully taken."   U.S.S.G. § 2F1.1 Application Note 8 (2000). Other than minor additions to the rule, the text of § 2F1.1 remained largely unchanged between 1987, the year that the first Guidelines Manual was published, and 2000, the year before the provision's repeal.   Unlike the current provision, § 2F1.1 made no reference to a reduction of the loss value based on sums returned to victims.

The 2001 edition of the Guidelines Manual completely overhauled the provisions relating to fraud by restyling the pre-2001 version of § 2B1.1 "Larceny, Embezzlement, and Other Forms of Theft; Receiving, Transporting, Transferring, Transmitting, or Possessing Stolen Property" as a new, comprehensive provision "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; *Fraud and Deceit*; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."   United States Sentencing Commission, AMENDMENTS TO THE SENTENCING GUIDELINES, POLICY STATEMENTS, AND OFFICIAL COMMENTARY 15–16 (May 1, 2001) (emphasis added).   The new rule included two provisions that persist in the U.S.S.G. in fundamentally the same form to this day: Application Note 2(E), "Credits Against Loss," and Application Note 2(F)(iv), "Ponzi and Other Fraudulent Investment Schemes."   U.S.S.G. § 2B1.1.   The Sentencing Commission's wholesale replacement of the pre-existing provision with a new, comprehensive provision covering theft of all types demonstrates the Commission's intention to implement a new sentencing policy for crimes of fraud.

In light of the history of the U.S.S.G., the government's appeal to *Nichols* and its underlying rationale is unavailing. In *Nichols*, the Eighth Circuit determined that, in spite of § 2B1.1's clearly-worded Application Notes, the funds returned to investors in the course of a Ponzi scheme should not be credited to the defendant because they were used to "perpetuate the fraud and ensnare new investors." *United States v. Nichols*, 416 F.3d 811, 820 n.6 (8th Cir. 2005) (quoting *United States v. Munoz*, 233 F.3d 1117, 1125 (9th Cir. 2000)). This determination was, however, fundamentally irrelevant to the holding of *Nichols*. As the Eighth Circuit stated, "[t]he fraud perpetuated in this case was not a typical Ponzi scheme. Nichols and Gomez did not claim to have generated 'returns' for investors. Instead, they refunded money to victims who requested refunds." *Nichols*, 416 F.3d at 820 n.6. The Eighth Circuit chose to apply the logic of several cases that dealt with loss calculations in the context of Ponzi schemes because it believed that "Nichols and Gomez returned funds to victims in order 'to perpetuate the fraud.'" *Id.* (quoting *Munoz*, 233 F.3d at 1125).

Critically, all of the cases upon which the Eighth Circuit based its reasoning pre-dated the 2001 amendments. In fact, many of the cases cited trace their source back to a decision of the Seventh Circuit, *United States v. Lauer*, which was decided in 1998, three years before the 2001 amendments to the Guidelines took effect. *See Nichols*, 416 F.3d at 820 n.6 (quoting *United States v. Lauer*, 148 F.3d 766 (7th Cir. 1998)). Thus, not only is *Nichols* not directly on point, it is predicated on logic from cases based on a different sentencing regime. It does not matter that those earlier courts convincingly applied equitable principles to Ponzi-scheme loss calculations. Once the Sentencing Commission promulgated new Guidelines provisions, those provisions became the controlling terms under which district courts were required to calculate a defendant's sentence.

The other precedent cited by the government is not logically applicable to this case. The government attempts to analogize Snelling's new investors (whose deposits were used in part to pay the earlier investors' "returns") to insurance companies and banks that make payments to fraud victims. *See United States v. Newsome*, 281 F. App'x 464 (6th Cir. 2008) (refusing to deduct from the defendant's loss figure the amounts paid by the auto-theft victim's insurance companies); *United States v. Erpenbeck*, 532 F.3d 423 (6th Cir. 2008) (declining to deduct the

value of civil settlements from defendant's loss figure, reasoning that defendant should not benefit from the fortuity of third-party payments to victims). Snelling's new investors were not third-party payers, but were instead fellow victims. The new investors did not pay the earlier investors. New investors paid Snelling in order to participate in his investment scheme and then Snelling, who had control of the funds at that point, paid some of it to the earlier investors in order to perpetuate the Ponzi scheme. The third-party-payment cases cited by the government are simply inapposite.

Admittedly, there is intuitive appeal to the government's argument that Snelling should not be allowed to benefit from the payments he made "not to mitigate the losses suffered . . . but to create the means to convince new victim-investors to pay him even more money." We need not reflect, however, on whether it is unseemly for Snelling to benefit from the money he paid out to investors in an effort to perpetuate his Ponzi scheme. Undoubtedly, it is. The only question we must consider is whether the district court correctly applied the Guidelines and whether it used a correct Guidelines range.

An accurately calculated Guidelines range is necessary for a procedurally reasonable sentence—any error in calculating the Guidelines range cannot survive review. *See Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007) ("[W]e must ensure that the district court correctly calculated the applicable Guidelines range which are the starting point and initial benchmark of its sentencing analysis.") (internal alterations and quotation marks omitted). As appealing as the government's argument may be, it does not comport with the text of the Guidelines. Accordingly, the district court was in error when it declined to reduce the loss figure by the value of the payments made by Snelling to his investor victims in perpetuating his Ponzi scheme.

IV

For the reasons set forth above, we VACATE Snelling's sentence and REMAND the case to the district court for resentencing.