**NOT RECOMMENDED FOR PUBLICATION**
File Name: 16a0352n.06

**No. 15-3725**


**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| DAVID J. KRAUS, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |


**BEFORE:** **BATCHELDER, McKEAGUE, and STRANCH, Circuit Judges.**

**STRANCH, Circuit Judge.** David J. Kraus pled guilty to making a materially false, fictitious, or fraudulent statement or representation to the United States Department of Agriculture, Farm Services Agency (USDA-FSA) in connection with the agency's administration of the Direct Loan Program, in violation of 18 U.S.C. § 1001. In order to determine Kraus's total offense level and sentencing range under the U.S. Sentencing Commission Guidelines, the district court calculated the total amount of loss to the USDA-FSA, including credit against loss for collateral Kraus had pledged to secure the loan, as required by Guidelines §2B1.1. In this expedited appeal, Kraus challenges the court's credit against loss calculation and the resulting total loss amount on which his sentence was based. We **AFFIRM** the court's calculations.

## I.    BACKGROUND

Kraus, a psychiatrist living and working in New York, owned and operated a winery adjacent to family farmland in Erie County, Ohio.  To support operation of the vineyard between 2005 and 2010, Kraus obtained $594,870 in loans through the USDA-FSA's Direct Loan Program.  Under the terms of the Direct Loan Program, Kraus pledged his vineyards and land, farming and wine-making equipment, and grapes and wine.  Kraus also was required to estimate his anticipated sales for each upcoming year, report his actual sales for the prior year, and notify the USDA-FSA of any new customers.  Kraus paid $122,556.97 of the loan's outstanding balance before becoming delinquent on the loan payments and eventually filing for bankruptcy.

On March 4, 2015, Kraus pled guilty to Count 3 of a five-count indictment—making a materially false, fictitious, or fraudulent statement or representation to the USDA-FSA, in violation of 18 U.S.C. § 1001.  Specifically, Kraus had falsified the 2008 tax return submitted to the USDA-FSA to show a larger loss from operating the winery in the 2008 tax year.  The tax return submitted by Kraus to the USDA-FSA reflected a business loss of $99,646, while the tax return submitted to the IRS showed a loss of $41,647.  The USDA-FSA learned of Kraus's falsification during an investigation it launched after discovering Kraus's failure to report $42,058 of the vineyard's 2009 grape and juice sales and his spending of the funds without authorization from the USDA-FSA.

Under the terms of the plea agreement, Kraus reserved the right to dispute the government's loss calculation and argue the appropriate net loss amount, an issue that the parties briefed before a two-day sentencing hearing was held.  At the hearing, the district court considered competing appraisals for the three categories of collateral pledged by Kraus:  real property, equipment, and wine inventory.  The real property consisted of two parcels, the Mason

Road Property and the Hayes Avenue Property. The parties agreed to exclude the Hayes Avenue Property from the calculation of credit because the USDA-FSA had a subordinate lien position and thus was unlikely to recover from it. Although the government mistakenly submitted an appraisal of the Hayes Avenue Property, the court did not rely on it in valuing the Mason Road Property.

Kraus offered an appraisal of the Mason Road Property by John F. Stauffer, who valued the property at $215,000 as of May 7, 2015 but did not personally inspect the vineyard. Kraus introduced a second appraisal of the vineyard separate from the underlying land that was completed on April 22, 2015 by Richard Carey, who owns a vineyard but is not a licensed appraiser. At the district court's request, the government provided an appraisal prepared by Pfeiffer Appraisal Service, LCC originally for the USDA-FSA, which valued the property at $163,000 on February 17, 2006. After finding Stauffer and Carey "not credible," the court adopted the Pfeiffer appraisal and increased Pfeiffer's valuation of the property by 5% to account for the length of time between the appraisal and sentencing. Kraus thus received a credit of $171,150 for the Mason Road Property.

With respect to the equipment collateral, the district court considered three separate appraisals. USDA-FSA Farm Loan Officer Kurt J. Leber valued the equipment at $101,442 in January 2010, auctioneer Steve Andrews at $60,350 in May 2010, and Carey at $147,435 in April 2015. The court adopted Leber's valuation after again finding Carey lacked credibility.

The district court, finding that Kraus intended to deprive the government permanently of the entire wine-inventory collateral, denied Kraus credit for all of it, not just the $42,058 that Kraus failed to report to the USDA-FSA.

The parties agreed that the starting point to calculate the final loss amount should be $472,313.03—the total loan amount minus Kraus's payments toward the outstanding loan balance. From this, the district court subtracted $272,592 in credit for the real property and equipment, resulting in a loss amount of $199,721. Pursuant to the Guidelines, because the court calculated the loss amount to be over $120,000, 10 levels were added for specific offense characteristics to Kraus's base offense level of six. *See* United States Sentencing Commission, *Guidelines Manual*, §2B1.1(b)(1) (Nov. 2014). After deducting three levels for acceptance of responsibility, Kraus's total offense level was 13, with a Guidelines range of 12 to 18 months of imprisonment. The court sentenced Kraus to 15 months imprisonment, a two-year term of supervised release, a $10,000 fine, and $447,406.33 in restitution. Had the court calculated the loss amount to be under $120,000, the increase for specific offense characteristics would have been smaller and the Guideline range would have been, at most, 8 to 14 months. *See* USSG §2B1.1(b)(1).

## II. STANDARD OF REVIEW

On appeal of a district court's application of Guidelines §2B1.1, we review de novo the method used to calculate loss, *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013), and the determination of "whether collateral should be considered when determining intended loss," *United States v. Calkins*, 193 F. App'x 417, 420 (6th Cir. 2006) (citing *United States v. Katzopoulos*, 437 F.3d 569, 574 (6th Cir. 2006)). We review the factual findings underlying the loss amount for clear error. *Wendlandt*, 714 F.3d at 393. Because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," USSG §2B1.1, comment. (n. 3(C)), the district court, for sentencing purposes, "need only make a reasonable estimate of the loss using a preponderance of the evidence standard," *Wendlandt*,

714 F.3d at 393. This court "reverses the valuation only if it is outside the realm of permissible computations." *United States v. Lutz*, 154 F.3d 581, 590 (1998).

## III. ANALYSIS

Guidelines §2B1.1 and its application notes outline the appropriate method to calculate the loss amount, which is used to determine a defendant's offense level and is designed to reflect his or her culpability. *United States v. Simpson*, 538 F.3d 459, 464 (6th Cir. 2008) (citing *United States v. Austin*, 479 F.3d 363, 369 (5th Cir. 2007) ("The Guidelines use loss as a proxy for the seriousness of the fraud.")). Where pledged collateral is involved, determining loss is a two-step process. First, sentencing courts must use the greater of actual or intended loss. USSG §2B1.1, comment. (n.3(A)). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," while "intended loss" means "the pecuniary harm that the defendant purposefully sought to inflict," even if "impossible or unlikely to occur." *Id.* In the context of loan-related fraud, "intended loss is the amount the defendant subjectively intended not to repay." *United States v. Moored*, 38 F.3d 1419, 1426 (6th Cir. 1994). Second, sentencing courts must reduce "the loss by the amount of money the victim recovered by selling the collateral, or the fair market value of the property at the time of sentencing if the victim has not disposed of the collateral." *United States v. Kerley*, 784 F.3d 327, 347 (6th Cir. 2015) (citing USSG §2B1.1, comment. (n.3(E)(ii))).

### A. Method of Calculation

The parties agree that the district court properly began its loss calculation with the total loan amount minus Kraus's payments toward the outstanding loan. Challenging the court's method of calculating loss at the second stage—applying credits against the loss for the pledged collateral—Kraus argues that the court misconstrues the meaning of "fair market value" as used

in comment note 3(E) of §2B1.1. Throughout its analysis at the sentencing hearing, the court adopted the government's definition of fair market value: "what the victim will recover from disposing [of] the collateral at the time of sentencing." Kraus may have even agreed with this position by yielding that the Hayes Avenue Property should not be considered for credit against loss because "the value of the property, whatever it might be, would likely result in zero recovery for the government." On appeal, though, Kraus maintains that fair market value should be the "retail value where the property was regularly sold in the retail market" by the defendant.

Kraus makes several interrelated arguments in support of his definition of fair market value. Kraus first points out that the 2001 Amendments to the Guidelines changed the language defining the value of undisposed pledged collateral from the amount the victim "*can expect to recover*" to the "*fair market value* of the collateral at the time of sentencing." *Compare* USSG §2F1.1, comment. (n.8(b)) (Nov. 2000) *with* USSG §2B1.1, comment. (n.2(E)(ii)) (Nov. 2001) (emphases added). But this change in the language of the Guidelines does not require that we abandon the perspective of the victim, as Kraus suggests. In fact, when collateral has been disposed of, the focus of the then-applicable version of the Guidelines remained on "the amount the victim has recovered," suggesting that fair market value should be assessed from the victim's point of view. *See* USSG §2B1.1, comment. (n.3(E)(ii)) (Nov. 2014).

Kraus also cites cases holding that the fair market value of the *actual loss* of a victim depends on the market in which the owner, *the victim*, was selling an item at the time it was stolen. *See United States v. Wasz*, 450 F.3d 720, 727 (7th Cir. 2006) (holding that, in determining actual loss of merchandise stolen from retailers, a reasonable estimate is retail value); *United States v. Hardy*, 289 F.3d 608, 613–14 (9th Cir. 2002) (finding error where victim's actual loss of wholesale goods were measured by retail price); *United States v.*

*Warshawsky*, 20 F.3d 204, 213 (6th Cir. 1994) ("The market value of goods stolen in wholesale lots from a wholesaler should be valued at . . . the wholesale price . . . rather than a fictitious retail price . . . ."). Because, according to Kraus, fair market value should have the same meaning throughout §2B1.1, he concludes from these cases that the fair market value of *credit against loss* should be based on the market in which the owner, *the defendant*, was selling the collateral at the time it was pledged.

Kraus's conclusion is not supported by the case law he cites or the Guidelines. There are two fundamental hurdles to Kraus's argument: he cites cases that address actual loss, not credit against loss; and the cases take the victim's perspective, not the defendant's. That the loss calculation assesses a defendant's culpability, *Simpson*, 538 F.3d at 464, suggests a conclusion opposite from Kraus's—that credit against loss should be based on the market in which the victim will dispose of the collateral. Viewing the value of the collateral from the victim's perspective best reflects the defendant's culpability because the price the defendant could demand in the market may be higher than what the victim can recover, and what the victim recovers impacts the total harm he or she suffered at the hands of the defendant. *See Wendlandt*, 714 F.3d at 394 (referencing with approval the Fourth Circuit's determination in *United States v. Mallory*, 461 F. App'x 352, 361 (4th Cir. 2012) (per curiam), that a defendant "receives the benefit of what the victims recovered, not what they foreseeably might have recovered"). And, contrary to the premise of Kraus's conclusion, looking at what the victim will recover keeps the meaning of fair market value consistent throughout §2B1.1—fair market value consistently takes the victim's perspective.

Kraus lastly argues that ignoring the price the defendant could demand leads to a commercially unreasonable valuation. However, merely because a victim's recovery is lower

than a defendant's market expectation does not necessarily make the recovery commercially unreasonable. In *Wendlandt*, moreover, the defendant similarly argued that the district court had accepted commercially unreasonable "fire-sale" valuations, based on an "unforeseeable downturn in the housing market," of the three properties he pledged as collateral. *Wendlandt*, 714 F.3d at 394. We held that, because the Guidelines require only a "reasonable estimate" that is not "outside the realm of permissible computations," the sentencing court need not employ a burden-shifting commercial reasonableness standard to assess fair market value of the pledged collateral. *Id.* at 397. The same is true here.

In a separate attack on the district court's methodology, Kraus contends that the court incorrectly assigned him the full burden of proving the value of the collateral. Our case law explains, however, that in the analogous context of credit against loss *for services rendered by the defendant to the victim* pursuant to comment note 3(E)(i) to §2B1.1, "the defendant has the burden of proving the specific [fair market] value by which the loss amount should be reduced." *United States v. Reid*, 764 F.3d 528, 534 (6th Cir. 2014) (citing *United States v. Washington*, 715 F.3d 975, 984–85 (6th Cir. 2013)). Kraus provides no basis for assigning the burden of proof differently for proving credit against loss *for pledged collateral* pursuant to comment note 3(E)(ii) of §2B1.1. *See United States v. VanderZwaag*, 467 F. App'x 402, 412 (6th Cir. 2012) ("[T]here is no obligation imposed by the case law for the government to obtain an independent appraisal of the property . . . in order to calculate the value of the property [collateral pledged]."). Kraus instead seeks to rely on *United States v. Scott*, but *Scott* is inapposite because it addresses the respective burdens for establishing mitigating and aggravating adjustments under Chapter 3 of the Guidelines, not the burden of proving a type of credit against loss under §2B1.1, comment note 3(E). 16 F.3d 1223, 1994 WL 25077, at *2 (6th Cir. 1994).

Because the district court employed the right definition of fair market value and properly assigned the burden of proof, we conclude that the district court applied the correct method in calculating the loss amount, including the amount of collateral.

## B.      Valuation of Mason Road Property

Kraus appeals the district court's valuation of both the Mason Road Property and vineyard equipment.   In valuing the Mason Road Property, the court made credibility determinations as to Kraus's appraisers and their reports.   The court emphasized that Stauffer had no experience appraising vineyards and had not personally inspected the vineyard to become familiar with the current condition of the vines, while Carey had not discussed the condition of the vines and, at any rate, "is not a wine appraiser.  He may own a winery but that does not make him an expert in appraisals."   The court then adopted the Pfeiffer appraisal, increasing the value by 5% to account for any appreciation between the appraisal date and the sentencing hearing. This set the fair market value of the Mason Road Property at $171,150.

Kraus argues that the Pfeiffer appraisal, even with the 5% adjustment, was too low because it predated the planting of vines on seven additional acres, which would have increased the Pfeiffer valuation of each acre by approximately $10,000.  But the government argued at the sentencing hearing that an inspection would demonstrate that the vineyard, in its current condition, added no value to the Mason Road Property.  Based on the record, the district court reasonably could have agreed and in fact may have done so, as it described the photos depicting the Mason Road Property at the time of sentencing as showing "property in disrepair[,] . . . weeds[,] and lack of attention."  Regardless, adding the approximately $70,000 to the value of the Mason Road Property would not have decreased the loss amount below $120,000, the

threshold for adding fewer specific-offense-characteristic levels to Kraus's base offense level. *See* USSG §2B1.1(b)(1).

In valuing the equipment, the district court again rejected Carey's appraisal, finding Carey "less than persuasive with respect to his analysis." The court noted Carey's lack of detail regarding the equipment and its condition, and failure to disclose market resources used to find comparable equipment and pricing, but appeared to rely primarily on its disagreement with Carey's conclusion that individual pieces of used and aging property had increased in value because of the increasing price of stainless steel. The court found Carey's reliance on the increasing price of stainless steel "just simply . . . not credible" and appears to have attributed Carey's higher total valuation of the equipment to this flaw. Kraus correctly points out that the court was silent on the Carey appraisal's inclusion of a higher number of items, which could have accounted for Carey's higher total valuation. Kraus's reasonable arguments, however, do not rebut the court's determination that Carey lacked credibility. In place of the Carey appraisal, moreover, the court adopted the Leber appraisal, upon which Carey heavily relied in valuing the equipment.

Under the generous latitude afforded to sentencing courts by the reasonable estimate standard, we cannot conclude that the district court clearly erred in discrediting the Stauffer and Carey appraisals or that the Pfeiffer and Leber appraisals were "outside the realm of permissible computations." *See Wendlandt*, 714 F.3d at 393, 396 (quoting *Lutz*, 154 F.3d at 590). Based on the record evidence, the court's valuations of the Mason Road Property and equipment were reasonable estimates.

C.        **Exclusion of Wine Inventory**

The district court denied Kraus credit for the value of the entire wine inventory.  At the sentencing hearing, the court announced:

> I confirm that the defendant may not profit from his fraud by claiming a credit for the bottled wine inventory.  I agree with the government that defendant's covert attempt to dispose of the wine inventory negates any allowance for this credit.  He used these sales for personal use.  He directed these sales, he fudged the books and should not be allowed to capture relief from this misconduct.  He, in short, hid the grapes and juice from the government.  And this fraud, the case law says, should not support a credit . . . .

The court then cited *Calkins*, 193 F. App'x 417, and *United States v. Nichols*, 229 F.3d 975 (10th Cir. 2000).

On appeal, Kraus challenges both the legal and factual underpinnings of the district court's holding.  Kraus takes issue with the court's factual finding that he intended to deprive the government permanently of the *entire* wine inventory.  The evidence, according to Kraus, at most shows that he failed to disclose $42,058 of proceeds from the sale of grapes and wine.

The record included evidence that Kraus:  failed to disclose many of his customers to the USDA-FSA; only repaid $122,000 towards the loan between 2005 and 2011, despite having over $2,000,000 in sales during that time period; stopped making payments in 2009 or early 2010, after which he brought in over $1,000,000 more; instructed an employee in 2011 to contact and sell to wineries that had not been subpoenaed by the USDA-FSA; and comingled his USDA-FSA loans with personal funds.  Although Kraus disputes large portions of the Presentence Report, he did not object to paragraph 21, which contains most of this information and was referenced by the district court.  In objections to the Presentence Report, Kraus does explain the motivations behind his comingling of funds and instruction to contact non-subpoenaed wineries, but he does not dispute the underlying facts.  The court was at liberty to discount Kraus's explanations and

make its own conclusions as to his intent. Based on this record, the court's factual finding that Kraus intended to conceal the entire inventory, which we review for clear error, is supported by evidence in the record and undisputed facts in the Presentence Report.

Challenging the district court's interpretation and application of the Guidelines and applicable case law, which we review de novo, Kraus argues that courts cannot deny credit for existing collateral in the government's possession at the time of sentencing, even if the defendant intended but failed to conceal it. In determining loss under the Guidelines, though, sentencing courts must use the greater of actual or intended loss. USSG §2B1.1, comment. (n. 3(A)). Even in the context of credit against loss, intended loss should be used if greater than actual loss because "[t]he fact that a victim has recovered part of its loss after discovery of a fraud does not diminish culpability for purposes of sentencing." *Nichols*, 229 F.3d at 979. Pursuant to the Guidelines then, credit may be denied for collateral that the defendant intended but failed to conceal, even if the victim has or will recover from that collateral.

We accordingly recognized in *Calkins* that under the "intended loss theory a court may decline to reduce the intended loss by the collateral pledged where the district court finds that the defendant intended to deprive the lender of its collateral. Such a finding has been supported where the defendant conceals the collateral." *Calkins*, 193 F. App'x at 421; *see United States v. Williams*, 292 F.3d 681, 686 (10th Cir. 2002). Tellingly, *Calkins* focused on the intent of the defendant rather than the existence of the collateral in concluding that, because there was "no way in which [the defendant] could conceal the collateral," the district court erred in finding that the defendant "intended to permanently deprive the banks of the collateral." *Calkins*, 193 F. App'x at 421.

Attacking the district court's equitable statement at the sentencing hearing that Kraus "should not be allowed to capture relief from this misconduct," Kraus relies heavily on the reasoning of *United States v. Snelling*, which rejected an equitable argument in similar but inapplicable circumstances. 768 F.3d 509 (6th Cir. 2014). There, the defendant participated in a Ponzi scheme that defrauded investors by soliciting funds for two fictitious financial companies. *Id.* at 510. The defendant argued that the loss should be reduced by the amount of money the defendant returned to the investor victims over the life of the fraud, *id.* at 512, as required by the Guidelines, *see* USSG §2B1.1, comment. (n.3(E)(i)) ("Loss shall be reduced by . . . [t]he money returned . . . to the victim before the offense was detected."). We reversed the district court's denial of credit for the money returned and rejected the government's equitable argument, explaining:

> [T]here is intuitive appeal to the government's argument that [the defendant] should not be allowed to benefit from the payments he made "not to mitigate the losses suffered . . . but to create the means to convince new victim-investors to pay him even more money." We need not reflect, however, on whether it is unseemly for [the defendant] to benefit from the money he paid out to investors in an effort to perpetuate his Ponzi scheme. Undoubtedly, it is. The only question we must consider is whether the district court correctly applied the Guidelines and whether it used a correct Guidelines range.

*Id.* at 514 (alteration in original). In other words, despite the district court's equitable concerns in *Snelling*, it could not ignore the Guidelines.

*Snelling* comports with the intent-based view of the Guidelines outlined by *Calkins* and *Nichols*. In *Snelling*, the defendant's return of money to a victim, though ultimately meant to attract new victims, speaks to the defendant's intent and necessarily reduces the defendant's intended loss amount as to that victim. Here, Kraus's concealment of proceeds and customers suggests an opposite intent—to hide the wine-inventory collateral from the government. Moreover, the district court's equitable concerns here, unlike in *Snelling*, are in line with the

outcome suggested by the Guidelines. Other cases cited by Kraus also turn on the defendant's intent, not the victim's possession of the collateral. *See United States v. Schild*, 269 F.3d 1198, 1202 (10th Cir. 2001) (affirming denial of credit for cattle pledged as collateral because not clearly erroneous for district court to discount the defendant's assertion that he did not intend to cause loss to the victim by selling the cattle).

Because the Guidelines allow credit to be denied for collateral that a defendant intended to conceal even if the victim will recover from it and because the district court did not clearly err in finding that Kraus intended to deprive the government of the entire wine inventory, we conclude that the court acted within its discretion in denying Kraus credit for the inventory.

## IV.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's calculation of the credit against loss and total loss amount.